[Cite as *Brown v. KRW Plumbing, Inc.*, 2024-Ohio-5944.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| TARA BROWN | : | |
| | : | |
| Appellant | : | C.A. No. 30080 |
| | : | |
| v. | : | Trial Court Case No. 2017 CV 05453 |
| | : | |
| KRW PLUMBING, INC. et al. | : | (Civil Appeal from Common Pleas Court) |
| | : | |
| Appellees | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on December 20, 2024

. . . . . . . . . . .

CRAIG T. MATTHEWS & DAVID M. DEUTSCH, Attorneys for Appellant

SUSAN M. SALYER, DAVID P. BOLEK & LAURENCE A. LASKY, Attorneys for Appellees

. . . . . . . . . . . .

EPLEY, P.J.

{¶ 1} Plaintiff-Appellant Tara Brown, on behalf of the Estate of James Rogers, appeals from a judgment of the Montgomery County Court of Common Pleas which granted Defendant-Appellee Donald C. Wright's motion for summary judgment in this suit

regarding liability for the death of Rogers. For the reasons that follow, the judgment of the trial court will be affirmed.

## I.      Facts and Procedural History

**{¶ 2}** In 2015, Donald Wright (through his agent and son Scott Wright) and Don Wright Realty, L.L.C., hired South Dayton Builders and Remodelers, which was owned by Scott Dickey, to construct a model home on Claxton Glen Court in Centerville on a parcel of land that Wright had owned since the early 1990s. The two entities had worked together in the past on other projects, including a similar model home in Springboro.

**{¶ 3}** The build progressed mostly according to plan (though there was testimony that the project was behind schedule) until June 2016, when the concrete driveway was poured before the water and sewer lines at the house had been connected to the main lines at the street. This was an issue because the pipes would run in very close proximity to the driveway, so close, in fact, that the plumbing work - which would involve digging a trench from the house to the street - could not be done with the driveway poured. The driveway being poured out-of-order was a problematic surprise for South Dayton foreman Jack Elsman, who testified that he had returned from vacation to find concrete poured and then had to figure out how to get the plumbing connections from the house to the street.

**{¶ 4}** Elsman testified that he wanted the whole driveway "taken up" to install the water lines, but that idea was vetoed by South Dayton owner Scott Dickey because, as Elsman explained, it would cost more money, and the company was in financial trouble. In fact, evidence was presented that Wright loaned South Dayton $125,000.

{¶ 5} Eventually, 80% of the concrete was removed, except for the sections closest to the house. But even with much of the driveway removed, the task of getting the lines from the house to the street was difficult; the trench had to be deep, and there was very little space between it and the neighbor's property.

{¶ 6} South Dayton hired KRW Plumbing to do the work, a company that Elsman described as "bottom of the barrel." Richard Williams, the owner of KRW, testified at his deposition that he was an indoor plumber and that he was not familiar with the specific safety requirements involved with excavating and trenching. KRW did not have the proper equipment to do a job of this magnitude either; South Dayton had to rent a backhoe so KRW could dig the trench.

{¶ 7} According to testimony, the trench was approximately 10-12 feet deep, 3 feet wide, and about 50 feet long, stretching from the house to the street. There were several issues, though, that compromised the safety of the project. First, because the trench was so close to the property line, the "spoils" (the excavated dirt) were placed on the edge of the trench, not at least two feet away to comply with safety standards. Second, because of the narrowness of the trench and the tight quarters with the neighboring property, the trench did not have an "angle of repose," a gradual sloping which reduces the potential for cave-ins. Finally, there was no "trench box" to secure the sides of the trench.

{¶ 8} At approximately 1:30 p.m. on June 15, 2016, KRW employee James Rogers was working in the trench when it collapsed, burying him alive. Others on-site rushed to his aid, trying to dig him out, but their efforts were unsuccessful, and Rogers died. His body was recovered many hours later.

{¶ 9} Brian Weiss, an Ohio Bureau of Workers' Compensation investigator, arrived on the scene within 45 minutes. He testified that he had observed "fissures" in the trench on the side where the spoils had been placed and believed that the weight of the dirt on the edge of the trench wall had been a factor in the collapse. He also testified that Rogers's body was found within one foot of the driveway slab that had not been removed, near the garage.

{¶ 10} On November 21, 2017, Tara Brown, Rogers's sister and the administrator of his estate, filed her initial complaint against KRW, Williams, South Dayton, Dickey, and Wright. The claim asserted causes of action for wrongful death and survivorship. In January 2018, Wright filed his answer and a cross complaint against KRW, Williams, South Dayton, and Dickey for indemnification and contribution. Claims against Dickey and Williams were dismissed after they filed for bankruptcy, and then in June 2019, Brown filed a new complaint which was almost identical to the first, but with Williams as the only defendant. After the 2017 and 2019 cases were consolidated, KRW and Williams were granted summary judgment and South Dayton settled with Brown, leaving Wright as the only defendant.

{¶ 11} On March 3, 2020, Wright filed a motion for summary judgment. In it, he argued that although he had hired South Dayton to build the house, he had not assumed any control or authority over the process or digging the trench. He further claimed that he had not "actively participated" or "controlled a critical variable" in the work environment and therefore was not liable for the trench collapse that claimed Rogers's life. A supplemental memorandum was filed in May 2021.

{¶ 12} Instead of filing a substantive response to the motion for summary judgment, in August 2021, Brown filed a motion for sanctions against Wright and South Dayton, asserting that they had failed to preserve electronically-stored evidence when they lost five cell phones which allegedly contained hundreds of text messages between Wright (Don and his son, Scott) and Dickey. At least some of the messages, according to Brown, discussed the Claxton Glen project. Brown stated that she could not file a response to the motion for summary judgment because she did not have the electronically-stored evidence, chiefly the purported text messages. As a sanction, Brown sought an order from the court entering judgment on the issue of liability, or alternatively, an order giving an "adverse inference" to support the denial of summary judgment.

{¶ 13} On September 1, 2022, the trial court overruled Wright's motion for summary judgment, finding that there were genuine issues of material facts as to Wright's liability, including that the Claxton Glen project had been behind schedule, that South Dayton had been having financial difficulties and had not been paying vendors and suppliers, that Wright had made a $125,000 loan to the builder, that Dickey could not explain why the driveway had been installed out of sequence, and that Dickey did not know who made the decision to pour the driveway.

{¶ 14} Then, on November 17, 2022, the court preliminarily declined to impose a liability judgment or adverse jury instruction against Wright for the loss of the cell phones. The court did, however, conclude that Wright and South Dayton had had a duty to preserve evidence that they should have known was relevant to the suit. It further stated that there was no way to determine how much Brown was prejudiced by not having the

phones or whether Wright and South Dayton had acted intentionally to deprive her of the evidence. Accordingly, it held off on making a final decision on Brown's request for the adverse inference until after a hearing could be conducted.

{¶ 15} Following the hearing in 2023, the court denied Brown a liability judgment and declined to order a jury instruction that the texts contained evidence that Wright "controlled a critical variable in the work environment, such that you may find [him] liable for the death of James Rogers."

{¶ 16} Trial was set to begin on January 22, 2024, but on January 16, Wright filed a motion in limine to exclude an affidavit from Brown's expert, David Gardner. Wright argued that Gardner's affidavit and the opinions therein were based on an adverse inference that Brown had not received and because he had stated in his deposition that he had no evidence that Wright actively participated in or controlled a critical aspect of the trench work. The court excluded the affidavit and its opinions.

{¶ 17} On the first day of trial, Wright made an oral motion, asking the court to reconsider its previous decision overruling his March 2020 motion for summary judgment in light of the exclusion of Gardner's affidavit and its opinions. A few weeks later, the trial court granted Wright's motion for summary judgment.

{¶ 18} Brown has filed a timely appeal.

**II.     Summary Judgment**

{¶ 19} Brown's appeal raises three related assignments of error, all alleging that the trial court erred (in different ways) when it granted Wright's motion for summary judgment.

{¶ 20} Pursuant to Civ.R. 56(C), a movant is entitled to summary judgment when that party demonstrates that there is (1) no issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party. *Rhododendron Holdings, LLC v. Harris*, 2021-Ohio-147, ¶ 22 (2d Dist.).

{¶ 21} "The burden of demonstrating that no genuine issues exist as to any material fact falls upon the moving party requesting a summary judgment." *Harless v. Willis Day Warehousing Co., Inc.*, 54 Ohio St.2d 64, 66 (1978). Once the moving party has satisfied its burden of showing that there is no genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing a genuine issue for trial. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). The nonmoving party cannot rely upon the mere allegations or denials in the pleadings but must give specific facts showing that there is a genuine issue for trial. Civ.R. 56(E). *Accord Geloff v. R.C. Hemm's Glass Shops, Inc.*, 2021-Ohio-394, ¶ 14 (2d Dist.).

{¶ 22} We review the trial court's ruling on a summary judgment motion de novo. *Martcheva v. Dayton Bd. of Edn.,* 2021-Ohio-3524, ¶ 35 (2d Dist.).

{¶ 23} Ultimately, for Brown to be successful in this case, she must demonstrate that Wright actively participated in the building process. The "active participation doctrine" imposes a duty of care upon a property owner to an independent contractor involved in an inherently dangerous activity on the property when the owner (1) directs the activity resulting in the injury; (2) gives or denies permission for the critical acts that led to the injury; or (3) retains or exercises control over a critical variable in the workplace that

caused the injury. *Hackney v. Ward*, 2014-Ohio-4413, ¶ 15 (2d Dist.). "Absent 'active participation,' . . . an owner cannot be liable in negligence due to the lack of a legal duty owed to the . . . independent contractor." *Evans v. Dayton Power and Light Co.*, 2004-Ohio-2183, ¶ 33 (4th Dist.). But before we can analyze whether there are any genuine issues of material fact proving Wright actively participated in the project, we must address Brown's procedural concern.

### III.    Consideration of Excluded Affidavit

{¶ 24} In her first assignment of error, Brown argues that the trial court erred by not considering Gardner's affidavit when it granted Wright's motion for summary judgment. It is her contention that the trial court should have gone "back to square one" when Wright asked it to reconsider the motion, and that included considering the excluded affidavit.

{¶ 25} Civ.R. 56(C) specifies that a trial court, in deciding a case on summary judgment, may examine "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence and written stipulations of fact, . . . timely filed in the action." Affidavit testimony must be based on personal knowledge and admissible under the Rules of Evidence. Civ.R. 56(E); *Reardon v. Hale*, 2007-Ohio-4351, ¶ 22 (12th Dist.).

{¶ 26} We conclude that the trial court did not err by not considering the Gardner affidavit because the affidavit was not based on personal knowledge, but assumptions. The affidavit stated, "***I take as true and assume the following***: a) that the cell phones

of Don Wright, Scott Wright, and Scott Dickey contained text message communications pertaining to the pouring of the driveway on the Claxton construction project; b) that the driveway was poured out of sequence because of pressure placed on Scott Dickey by Donald Wright and/or Scott Wright because the project was delayed in its completion and Scott Dickey owed the Wrights significant money." (Emphasis added.) It was only based on those assumptions that Gardner was able to opine that Wright had exercised control over critical aspects of the construction. There was no evidence that he saw the purported text messages confirming that either Don or Scott Wright told South Dayton to pour the driveway out of order or that it was done to speed up the building process. In fact, there was no evidence in the record that the missing cell phones had any text messages on them.

{¶ 27} It was proper that the court did not consider the Gardner affidavit because it was not based on personal knowledge as Civ.R 56(E) requires, but it would also have been excluded by Evid.R. 703, which states, "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by an expert or admitted in evidence at the hearing." Again, Gardner did not see – *perceive* – the text messages. The opinion in the affidavit was solely based on assumptions of what the texts *might* have contained.

{¶ 28} Brown's first assignment of error is overruled.

### IV.    Genuine Issues of Material Fact

{¶ 29} In her remaining assignments of error, Brown argues that the trial court erred by not properly considering evidence in her favor. We take that to mean the trial

court erred by not finding that there were genuine issues of material fact that cut in Brown's favor, which would have allowed the suit to survive the Wright motion for summary judgment. We agree with the trial court that there were no facts to be found that could have led a reasonable mind to conclude that Wright exercised control over a critical variable in the workplace that led to Rogers's death.

{¶ 30} Elsman, South Dayton's foreman or project manager for the job, testified that while he would sometimes get calls or texts from Scott Wright regarding the whereabouts of Dickey, the owner of South Dayton, "[w]e never talked literally anything about the job." Elsman Depo. at 12. And while there was testimony that Wright was "hands on," it was only in terms of making detail selections (like choosing the color of caulking) or making change orders like changing bricks to stones. The following deposition exchange is illustrative:

Q: What kind of input do you recall Scott Wright had into the job at Claxton Glen?

A: I mean, it was pretty much as most homeowners would go in and pick.

Q: Right. I got that, the colors and brick and all types of things.

A: Yeah.

*Id.* at 23-24.

{¶ 31} Scott Wright was also deposed. He testified that his responsibility in the project was limited to signing the checks. Wright noted that he had never been provided with a construction schedule for the project and had not asked for one. As to the work on the trench, he testified that he did not know any of the subcontractors or about any costs or details of the job because the construction contract required Dickey and South Dayton

to pay for that sort of work. As to his contact with Dickey, Wright believed that his conversations had been limited to payments and about a neighbor who had complained about trash from the construction site. Most of the conversations on Claxton Glen were, "Hey, I finished the rough-in carpentry, can I get my draw[?]" Wright did not believe he had talked to Elsman about Claxton Glen.

{¶ 32} Scott Dickey similarly testified that Wright had almost no involvement in the construction of the house and that the $125,000 loan he received from Scott Wright was to help grow the company; he used it for capital.

{¶ 33} Finally, there was the deposition testimony of David Gardner, Brown's expert. He testified that there was no evidence of what the communication between Wright and Dickey entailed and admitted that it was common for landowners to talk with their builder. He also stated that there was no evidence that Wright had directed the sequencing of the pouring of the concrete driveway or that he had controlled or supervised the work done by KRW Plumbing. Finally, he had no opinion on whether Wright had actively participated in any of the work done on the house.

{¶ 34} Based on the evidence in the record, we conclude that there was no genuine issue of material fact as to whether Wright actively participated in the work that caused Rogers's death. The second and third assignments of error are overruled.

## V. Conclusion

{¶ 35} The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

WELBAUM, J. and BYRNE, V.J., concur.